SCHREMMS *v.* PERE MARQUETTE RAILROAD CO.

RAILROADS—INJURIES AT CROSSINGS—CONTRIBUTORY NEGLIGENCE —PRESUMPTIONS.

> Where a traveler on the highway is killed at a railroad crossing by a locomotive running backwards at a high rate of speed and displaying no light except a red signal not intended to cast light ahead, and there is evidence that the statutory signals were not sounded, but no eyewitnesses to the killing, there is no presumption that deceased failed to stop, look, and listen, and was therefore guilty of contributory negligence.

Error to Saginaw; Beach, J. Submitted February 14, 1906. (Docket No. 163.) Decided July 23, 1906.

Case by Michael Schremms, Jr., administrator of the estate of Michael Schremms, deceased, against the Pere Marquette Railroad Company, for the negligent killing of plaintiff's intestate. There was judgment for plaintiff, and defendant brings error. Affirmed.

*F. W. Stevens* (*John C. Weadock*, of counsel), for appellant.

*Eugene Wilber* and *Fred L. Eaton*, for appellee.

MOORE, J. The plaintiff recovered a judgment in the court below. The defendant brings the case here by writ of error.

The claim of defendant, as stated by its counsel in their brief, is:

"There is no testimony in this case as to the conduct of the plaintiff's intestate as he approached the crossing, and in so far as establishing freedom from contributory negligence is concerned, the plaintiff rested his case entirely on the presumption that his intestate did stop, look, and listen before going upon the track of the defendant. The trial

court left it to the jury to say whether or not this presumption had been overcome by the evidence.    This was error. The undisputed testimony shows that if plaintiff's intestate stopped, looked, and listened, he must have seen or heard the approaching engine, and raises the conclusive presumption that he did not stop, look, and listen, or that if he did, he did not heed what he saw or heard.

"One who is struck by a moving train which could be seen or heard from the point he occupied when it became his duty to stop, look, and listen, must be conclusively presumed to have disregarded that duty, or having performed it, to have gone negligently into obvious danger. [Citing *Kwiotkowski* v. *Railway Co.*, 70 Mich. 549, and many other cases.]

"Had he stopped and listened for the train as it was his duty to do, he would have heard it, and avoided the danger.    The presumption, therefore, is that he either did not do his duty in these regards, or that he ventured blindly into an obvious peril.    The judge should have directed a verdict for the defendant, on the ground that plaintiff had failed to show that his intestate was free from contributory negligence."

There is not very much dispute about the law, but the difficulty comes in applying it to a given case, therefore it is important to recall the case made by the testimony of the plaintiff.

Plaintiff's intestate was instantly killed by the tender attached to one of defendant's locomotives, as he was driving across a highway crossing, a short distance north of Saginaw, on the evening of November 14, 1904.    There was no eyewitness of the accident.    The highway at that point runs north and south, and the railroad track, which is elevated somewhat above the level of the surrounding country, runs northeast and southwest.    Plaintiff's intestate approached the crossing from the south, and the locomotive with which he collided approached from the southwest.    In the daytime the traveler approaching the crossing from the south could for nearly all of the time see a locomotive approaching from the southwest for a half mile before he reached the crossing.    The objects that would tend to obstruct his vision at any time were some

small buildings, the telegraph poles, and some trees. Plaintiff's intestate was familiar with the crossing, having traveled over it almost daily for many years. He had a gentle team and was a good driver. The tender which struck him was moving backwards from Saginaw toward Bay City, at the time of the accident. There was a red light hanging on the tender, which was in front, as the locomotive with the tender attached was running backward. There were also two small white classification lights on the sides of the smoke stack. The headlight was in its usual place on the head end of the engine.

Plaintiff introduced evidence tending to show that defendant's engine approached this crossing running at a rate of 25 or 30 miles an hour, and that the locomotive whistle was not sounded before the engine reached the crossing, and that the bell was not ringing. It was the claim of defendant that the crossing signals were given. The highway near the crossing had been recently graveled, and a wagon in motion over it would make considerable noise. It was very dark at the time of the accident, and there was some wind from the northeast. The locomotive left Saginaw some time after 5 :45 p. m., ahead of a passenger train which was to leave a little later. The fireman testified, among other things :

" As we approached the crossing, I looked ahead. I was on the side from which Mr. Schremms approached the crossing. It was dark that night, and I did not see Mr. Schremms, nor did I see the wagon or team. When we got to the crossing I heard a noise and the dirt flew up by the windows and I hollered over to the engineer that I thought we had torn up the crossing."

The engine was then stopped, and the fireman went back to warn the expected passenger train. Neither the fireman nor engineer knew they had struck a team and wagon until after the engine was stopped.

On the cross-examination the fireman testified :

" I did not see Mr. Schremms or his team. I thought we had struck the crossing and torn it up as we went

across.  I had no idea that we had struck a double team.

" *Q.* How far were you from this red light hung on the rear of the tender?

" *A.* About 13 or 14 feet.

" *Q.* That light would shine out on the track, wouldn't it, what light there was?

" *A.* Well, it wouldn't show the rails or anything like that.

" *Q.* Well, I mean the light that would be thrown forward would be thrown towards this team, wouldn't it?

" *A.* Yes, sir.

" *Q.* Tell me why when you were looking right there at that crossing you couldn't see that team?

" *A.* There wouldn't be enough reflection to see a team, with a red lamp.

" *Q.* You couldn't see a double team by that light 13 feet away, that is true, is it?

" *A.* Yes, sir.

" *Q.* It couldn't have been a very brilliant light, could it?

" *A.* Well, I don't think you could see anything with a red lamp anyway.   *   *   *   The classification lights were white lights on each side of the smoke stack. They would not throw any light in the rear of the tender.  They didn't help to discover the team on the track.  The classification lights are placed so that they show only a little light on each side—about 3 inches in diameter.  They are not intended to throw any light to the rear.  It is usual when we are running an engine and tender to have a red light in the rear.  If we had cars we would have had 3 or 4 red lights on the back end of the caboose.  We never run trains in the night-time without having red lights on the rear.  If we had a headlight placed on the rear of the tender it would have shown a bigger light, and would light up the track quite a distance ahead of us.  We had not been in the habit of running this engine over the track at this hour of the day before.  I don't know whether the engine had ever been down there before that time or not."

On the redirect examination he testified:

" The engine we had was a large engine called a consolidated engine.  I have had occasion to see red lamps frequently.  They are not used for the purpose of throwing light to see by, but for the purpose of being seen.  On a train we would also have more than one red light at the

rear. The regulation is three red lights and sometimes they have four; one on each side of the caboose and the deck light in the cupola of the caboose."

The testimony of the engineer did not differ materially from that of the fireman.

Counsel in their brief say it is a matter of common knowledge that a red light is always a warning of danger. It might also be added that it is a matter of common knowledge, that red lights are displayed at the rear of trains. This is also shown by the testimony of the fireman and engineer. In the direction from which the train was approaching the deceased, there was a red switch light leading to a siding which ended before it reached the highway. At this point the railroad track made a decided curve, so that when the deceased was 40 to 60 feet away from the track, the locomotive and tender, instead of coming toward him at an angle, were coming directly toward him, making it difficult to tell whether the train was coming or going. The situation, then, was that Mr. Schremms was approaching a highway crossing with which he was perfectly familiar, when it was very dark, at a time when a passenger train might be expected soon to go north. For nearly all the time he could have seen a well lighted passenger train, or a freight train equipped with a headlight for a long distance. He knew that. If he looked he did not see a passenger train nor did he see an approaching train with a headlight. If he saw any light at all it was a red light, which, so far as it conveyed any information at all in relation to the proximity of a train, would indicate that he was looking at the rear of a train instead of an approaching one; or that what he saw was the switch light leading to the siding before mentioned, of which he had knowledge. But it is said had he stopped and listened he would have heard, and the testimony of Mrs. Lawrence is cited to sustain that claim. Her house is about eight rods south of the crossing. She was listening for the train upon which she expected her husband to come.

"I was waiting to hear the whistle, when I heard a train rushing by at a terrible speed.   I thought to myself 'Is that the train?   I didn't hear it whistle.'   I rushed to the kitchen window and pushed up the curtain as the engine went by.   * * *

"Q. Now, you heard the bell ringing?

"A. I heard the bell after I put the curtain up once or twice.   * * *

"I could see or tell by the noise that it was an engine. I saw just a faint light as it passed.   It had just passed the house when I saw it.   I just had an instant to look at it, but in that instant I saw this light.   As I looked at it I thought it had just crossed the highway.   It had crossed over the culvert."

This indicates clearly that this witness heard no whistle. That when she first heard the noise of the train, it was rushing past the house; that she at once pushed up the curtain, and that it was not until after this she heard the bell, and simultaneous with this the tender and engine crossed the highway.   Giving this testimony its fullest effect there is nothing in it indicating the engine could be heard or that the bell was rung in time to be of any use whatever to the deceased.

There were other witnesses in a position to hear, who heard neither bell nor whistle.   The testimony we have already quoted shows it was so dark the engineer and fireman did not know they had struck this team until after the engine was stopped.   How then could they know when to whistle for the crossing?   Certainly not from seeing the approach to it, though it is quite possible the switch light might have aided them.   But even if the deceased had heard the noise and knew it to be an engine, upon seeing the red light, which indicated the rear of it was toward him, he might naturally suppose it had been putting cars on sidings, and was on its way back to the city.

The precaution Mr. Schremms was bound by the law to take was the care that an ordinarily prudent man would have exercised under like circumstances.   It cannot be said from the evidence in this case that he did not do so. He is not here to give his version of the transaction.   In

the absence of testimony to show otherwise the presumption is he was in the exercise of due care. See *Mynning* v. *Railroad Co.*, 64 Mich. 93.

In *Staal* v. *Railroad Co.*, 57 Mich. 239, Justice CAMPBELL, speaking for the court, said:

"In the absence of any knowledge of what was passing in his mind, we cannot hold him conclusively at fault unless there is no sensible explanation to the contrary reasonably possible. But he had a right to suppose that defendant would not violate any legal duty, and he could not be bound to suppose it would fail to take reasonable measures to prevent mischief."

It cannot be said in this case that, because Mr. Schremms was killed, the presumption that he looked and listened is overcome. If the train had been running with a headlight where it belonged, where the traveler on the highway could have seen it, and he was then killed, a very different question would be presented. As bearing upon the degree of care required, see, also, *Guggenheim* v. *Railroad Co.*, 66 Mich. 150. It was not error for the judge to refuse to direct a verdict for defendant. The testimony of the engineer and fireman as to the manner of running this train upon a dark night, without proper equipment to indicate its proximity to one traveling upon the highway, indicates such a reckless disregard of the rights of the traveler upon the highway as to merit the severest censure.

Judgment is affirmed.

MCALVAY, GRANT, BLAIR, and MONTGOMERY, JJ., concurred.