RICHARDSON *v.* DETROIT & MACKINAC RAILWAY CO.

1. RAILROADS—NEGLIGENCE—SPEED—TRAINS—OPERATION.

Evidence that defendant's extra train passed through a station on its line about midnight, running at from 30 to 40 miles an hour, striking and killing decedent, who was waiting for a passenger train, that the night was dark and misty and no headlight was displayed, although two lanterns were placed on the rear of the engine which was running backward, that there was no light at the station or in the yard, and that decedent was found in such a position as to permit of the inference that she was standing beside the track when the train struck her, with testimony in defendant's behalf tending to contradict plaintiff's claims as to speed and the failure to give statutory signals, warranted the trial court in submitting to the jury the question of defendant's negligent operation of the train.[1]

2. SAME—CONTRIBUTORY NEGLIGENCE.

Considering her conduct in the light of the presumption that the deceased was in the exercise of reasonable care, testimony that the lights on the advancing train might easily have been mistaken for switch lights, that greasy spots were discovered on her clothing which might have been caused by catching in the machinery, and the condition of her clothing as well as the injuries found on the body were consistent with the theory that she was not on the track, the evidence presented a question of contributory negligence for the jury.

3. SAME—CAUSE OF DEATH.

Whether the extra train which passed through the station just before midnight caused the death of decedent, under evidence tending to show that it passed at 11:50 p. m.

[1] As to running train or car between standing train and station, see notes in 13 L. R. A. (N. S.) 620; 27 L. R. A. (N. S.) 128; and 31 L. R. A. (N. S.) 338.

Upon the carrier's duty to prevent passengers at stations from going into dangerous places, see note in 32 L. R. A. (N. S.) 198. And for the degree of care toward passenger at station, see note in 33 L. R. A. (N. S.) 855.

and that° the watch of deceased stopped at that hour, was a question of fact, in connection with other testimony tending to show the body was cold when the regular train arrived.

4. SAME—LIGHTS—STATION.

It was as favorable to defendant as the evidence warranted, for the trial judge to eliminate from the issues the claim that the station was not properly lighted, on the theory that deceased had waived such requirement; defendant had no reason to complain of instructions leaving the failure to provide lights as one of the conditions surrounding the accident to the jury, as bearing on the question of negligent operation of the train.

5. DAMAGES—DEATH ACT—NEGLIGENCE.

Under 2 Comp. Laws, § 6309 (3 How. Stat. [2d Ed.] § 6664), providing that the amount recovered in an action for the killing of an intestate person shall be distributed to the persons and in the proportions provided in the law governing the distribution of personal property of intestates, a sister of decedent, whose father and mother were living at the date of decease, not being entitled to share in the estate, would not be entitled to consideration, although the surviving sister was an invalid, dependent on the decedent: the court committed prejudicial error in permitting the jury to base the damages awarded on the loss to father, mother, and sister.

6. SAME—ACTIONS—INDIGENT PARENTS—POOR LAW.

Plaintiff's right to recover was not defeated by the fact that decedent voluntarily contributed to the support of her infirm and aged parents, and that no steps had been taken to compel contribution under 2 Comp. Laws, § 4487 et seq. (2 How. Stat. [2d Ed.] § 3478 et seq.).

Error to Arenac; Sharpe, J. Submitted June 18, 1913. (Docket No. 45.) Decided July 9, 1913.

Case by Wallace B. Richardson as administrator of the estate of Edith I. Barhite, deceased, against the Detroit & Mackinac Railway Company for the negligent killing of decedent. Judgment for plaintiff. Defendant brings error. Reversed.

*Henry, Henry & Henry (James McNamara,* of counsel), for appellant.

*B. J. Henderson* and *Hall & De Foe,* for appellee.

STONE, J. This is an action on the case brought by the administrator of the estate of Edith I. Barhite, deceased, against the defendant to recover damages under sections 6308 and 6309, 2 Comp. Laws (3 How. Stat. [2d Ed.] §§ 6663 and 6664). It is alleged that plaintiff's decedent met her death through the negligence of the defendant in the operation of one of its trains. From a judgment in favor of the plaintiff rendered in the circuit court for the county of Arenac, the case is brought to this court for review upon writ of error.

The plaintiff's intestate was an unmarried woman 37 years old at the time of her death. For 20 years she had been teaching school in different places in Michigan. In June, 1911, she had just finished teaching a term in Maple Ridge, Arenac county, and had left intending to go to Hillman, Montmorency county. The defendant operates a railroad from Bay City on the southerly, to Cheboygan its northern terminal through the village of Turner, in Arenac county, at which place a depot and depot grounds are maintained by the defendant. Turner at the time referred to herein was a village of between 400 and 500 inhabitants. In describing the general situation of the buildings and tracks in Turner reference is had to the attached map.

The main line of the defendant's road runs northeasterly and southwesterly through the village. Main street runs east and west. On the south side of Main street, 139 feet east of the main line, is the hotel in which plaintiff's decedent spent the evening of the night she met her death. On June 22, 1911, plaintiff's decedent was brought from Maple Ridge to Tur-

ner, arriving there about 9:30 p. m. local time. She first went to the depot and left a trunk on the west side thereof. After visiting a store, she went to the Turner Hotel. It was her intention to take the 12:14

a. m. No. 9 train north. She was given permission to remain in the hotel until train time, and she told the proprietor that she did not want any one to stay up with her; that she had taken the train before from Turner, and needed no assistance. She was last

seen lying on a couch in the sitting room of the hotel about 10:15 p. m.    The defendant's local station agent saw and talked with Miss Barhite that evening at the hotel.    She said that she wished to go to Alpena, and he explained to her what she should do to see that her trunk was put aboard the train, and he offered to wire North Bay City in reference to it, but she said it was not necessary.    He gave her the correct time, and saw that her watch was right.    He offered to light the depot and leave it open for her, but she said she preferred to remain at the hotel.

On the night in question passenger train No. 9 left Bay City, according to the train sheet, at 11:25.    It was late, and did not arrive at Turner until 1:10 a. m. On the night in question, Engineer Gurly, then at Bay City, received orders to back up to Sagining, about 25 miles north of Bay City, and at that point to change engines with a passenger train going south drawn by engine No. 24.    The engines were exchanged, and Gurly in charge of engine 24 proceeded north towards East Tawas passing through Turner.    This engine had a broken back-up eccentric strap on the left side, but this in no way affected the running of the engine. Extra 24, as this train was known, comprised engine No. 24 and tender and a baggage car.    The engine was headed south, and the baggage car was coupled to the front end of the engine.    The train, therefore, stood so that the tender of the engine was to the north and the baggage car to the south.    Extra 24 in this position backed north toward East Tawas.    A red light and a white light hung on the advancing end of the tender.    There was no headlight on that end.    A lighted headlight shone to the south, and into the baggage car which was coupled to the engine.    This train left Sagining for East Tawas about 10:45 p. m.    Engine 24 carried an automatic bell, and there was testimony that it was ringing throughout the run,

and as it passed through Turner. There was also testimony that as the train approached Turner the engineer blew one long whistle, and when within 500 or 600 feet of the depot he blew another crossing whistle. There was a conflict in the testimony as to the time and rate of speed at which extra 24 passed through Turner; the plaintiff claiming that it ran at from 30 to 40 miles an hour, and that it passed through there at 11:50 p. m., while the defendant claimed that it ran through Turner at a speed of from 18 to 20 miles an hour, and at 11:10 p. m. All agree that none of the crew on this train noticed anything unusual in passing through Turner, and nobody had any knowledge of running into or over any person or thing. Freight train No. 17 left North Bay City at 9:17 that evening for the north. The train was a regular one, and comprised 55 freight cars. It passed through Turner that night about 12:14 a. m. at a speed of about 20 miles an hour. The headlight on this train was burning and in good condition. That train crew had no knowledge of running into any one.

The baggageman on the passenger train, which arrived at 1:10 a. m., alighted and was the first person to discover the body of Miss Barhite. A box car stood on the westerly side track, the south end of which was from 50 to 70 feet north of the north end of the depot. The baggageman jumped from a door in the baggage car, which was near the south end of the box car. The body was about three feet north of the door of the baggage car, about the middle of the box car. Miss Barhite's watch first attracted the attention of the baggageman. It was at his feet as he jumped from the car. It had stopped at 11:50. The body was three or four feet north of the watch, lying about two feet from the rail of the main track between the baggage car and the box car. One limb had been carried up the track, and was four or five rods north of the body.

One or two books were found north of the box car. The body was found lying face down, and parallel to, and about two feet from, the main track. There were no electric lights in Turner in the vicinity of the depot, and the station was not lighted. It had not been customary for the defendant to keep its agents at its stations along the line north of Bay City after the evening train went south, which was due to arrive in Bay City at 9:30 p. m. No one saw plaintiff's decedent at the time of the accident whereby she met her death. Upon the trial of the case the jury rendered a verdict in favor of the plaintiff for $3,000.

Under the errors assigned the appellant has discussed the questions involved under the following heads:

(1) No negligence can be imputed to defendant as a matter of law.

(2) The negligence of plaintiff's intestate so contributed to her death as to bar any recovery as matter of law.

(3) The cause of the death of the plaintiff was speculative and conjectural, and should not have been left to the jury.

(4) The fact that the station was not open and lighted was not the proximate cause of the death of plaintiff's intestate, and should not have been left to the jury in connection with any question whatever.

(5) The court erred in instructing the jury respecting intestate's duty to her parents and sister, and contributions to them.

(6) The court erred in refusing to instruct the jury as requested by defendant's counsel.

(7) The trial court erred in denying defendant's motion for a new trial.

Before discussing the assignments of error, it may be well to state that three special questions were submitted to the jury by defendant's counsel. They were as follows:

"(1) Was extra train with engine No. 24 going north, with Chambers, conductor, Gurly, engineer, Luce, fireman, and La Barge, brakeman, on the night of June 22, 1911, equipped with one or more lights on the northerly and advancing end of the tender as it passed through Turner?"

This question was, by consent of plaintiff's counsel, answered in the affirmative.

"(2) Did Engineer Gurly, of above extra, blow his whistle on approaching Turner?"

To which the jury answered: "Yes."

"(3) Was there an automatic bell ringing on above engine as it passed through Turner?"

This question the jury answered: "Yes."

1. It is the claim of defendant that there was no evidence of negligence on its part in the operation of this train, extra No. 24. The jury found, and the plaintiff conceded, that there were two lights burning on the northerly or advancing end of this train. These were both ordinary railroad lanterns, and there is testimony that they looked about the same as ordinary switch lights. The jury also found, as we have shown, that the whistle was blown on approaching Turner, and that the automatic bell was ringing, and the evidence on this question need not be referred to. Under this head, the important question is whether there was any evidence of negligence on the part of the defendant in its manner of operating the train through Turner in the condition it was.

The trial court submitted the case to the jury on the question as to whether or not the train was operated at an excessive rate of speed in view of the conditions as to lights, the darkness of the night, and the conditions surrounding the station, saying:

"I am going to submit that question to you to say, in view of the way in which this train was operated

at that time, whether or not they ran it at an excessive rate of speed."

As we have already said, there was a sharp conflict in the evidence as to the rate of speed at which the train was run through Turner. It is the contention of the defendant that the rate of speed was immaterial; that if it complied with its rules relative to the proper lighting of its train, if it blew the statutory whistles, and if it properly caused its bell to ring, it could operate its engine at any speed it saw fit in going from Sagining to East Tawas on the night in question. It was testified to by the train crew that the defect in the engine did not retard its speed, that it was capable of running better than a mile a minute, and that the average rate of speed in making the run from Sagining to East Tawas was 37 to 38 miles an hour. A careful reading of this record has satisfied us that the rate of speed of this train was a material question, and that it was properly submitted to the jury. While it was probably not negligence to operate this engine backwards through Turner station, yet, considering the surroundings, all agreeing that it was a dark, misty night, that the station and yard were unlighted, that the train was lighted by lanterns—all these raised a question for the jury. Certainly, in the light of the evidence, it would be an unusual thing to run a train backward, without a headlight by a station at a rate of speed from 30 to 40 miles an hour.

It is the claim of the defendant in this case that it was necessary to back this engine to East Tawas. Perhaps it would be more correct to say that it was a matter of convenience, as the record shows that the engine could have been run to North Bay City, a distance of about 25 miles, and there turned around and run to East Tawas in the usual manner. Most certainly we can say that there was evidence of an undue and unusual rate of speed, which, under the

circumstances, raised a question for the jury. *Line* v. *Railway Co.*, 143 Mich. 163 (106 N. W. 719) ; *Gorton* v. *Harmon*, 152 Mich. 473 (116 N. W. 443, 15 Am. & Eng. Ann. Cas. 461) ; *Morgan* v. *Railroad Co.*, 162 Mich. 573 (127 N. W. 683) ; *Schremms* v. *Railroad Co.*, 145 Mich. 190 (108 N. W. 698, 116 Am. St. Rep. 291) ; *Canerdy* v. *Railway Co.*, 156 Mich. 211 (120 N. W. 582) ; *Garran* v. *Railroad Co.*, 144 Mich. 26 (107 N. W. 284) ; *Monroe* v. *Railway Co.*, 129 Mich. 309 (88 N. W. 888) ; *Van Auken* v. *Railway Co.*, 96 Mich. 307 (55 N. W. 971, 22 L. R. A. 33).

2. Was the plaintiff's decedent, as matter of law, guilty of contributory negligence? This question was submitted to the jury by the learned trial judge. The decedent is not here to give us her version of the transaction. In the absence of her testimony, the presumption is that she was in the exercise of due care. We have examined the cases cited by appellant, and do not think they are controlling of this question. The proximity and relation of the box car to the main track, the darkness of the night, and the readiness with which the lights upon the approaching train might have been mistaken for switch lights in the yard, peculiarly raise a question for the jury upon this subject.

We gather from the record that plaintiff's decedent had probably reached the depot, and had removed her trunk from the west side of the building, where she had previously left it, to the northeast corner of the platform, two or three feet from the corner of the building, where it was found after the accident. This tends to show that she was probably expecting a train, and may have mistaken the train by which she was killed for the regular passenger train. It would seem, also, from the evidence that, had she been upon the track and struck by the square end of the tender, both the body and the articles found would probably have

been found upon the main track. The undisputed evidence shows that the track was examined, and no evidence of blood was found thereon. One witness testified there was "nothing indicating where she was struck or where any portion of her body had been on the rail underneath the wheels," making it quite evident that her limb was not severed by being run over by the engine, the evidence showing that it had been carried some distance by the engine. The doctor who examined the body detailed at great length the condition of it, and of the clothing, and described the greasy spots or streaks on her clothing, indicating that the same may have come in contact with the machinery of the engine while she was standing opposite it. There is also evidence of the undertaker who examined the premises the next morning. He found some of the deceased's hair on the framework of the bottom of the box car about the center of the car, and some of her teeth underneath on the ground. The conclusion to be drawn from this testimony was in our opinion one for the jury. It is quite probable that the engine and car unexpectedly rushed by, taking plaintiff's decedent unawares while she was looking for her train.

If this train was running at the rate of speed claimed for it by plaintiff's witnesses, it is apparent that the suction from the rapid motion of the train may have drawn the skirts of decedent into the driving wheel, or machinery, causing the marks or grease spots described upon her clothing, and tearing her clothing from her hips, and winding it around her feet, as described by the doctor. This might draw her legs into the machinery, and may have severed the one and broken the other, as described. Under the evidence, we are of the opinion that the question of contributory negligence, especially in view of the presumption that she was in the exercise of due care,

was properly left to the jury. *Staal* v. *Railroad Co.*, 57 Mich. 239 (23 N. W. 795) ; *Underhill* v. *Railway Co.*, 81 Mich. 43 (45 N. W. 508) ; *Mynning* v. *Railroad Co.*, 64 Mich. 93 (31 N. W. 147, 8 Am. St. Rep. 804) ; *Schremms* v. *Railroad Co.*, *supra.*

3. Was the cause of death conjectural? It is claimed by defendant that the verdict was conjectural, both as to the negligence of the defendant and the contributory negligence of the plaintiff's decedent. It is also claimed that no testimony in the case warrants the legitimate inference that it was engine extra No. 24 that caused her death. It was conceded at the trial that decedent was killed by a train of defendant, and the court in its charge, referring to this concession, said:

"By the appearance it is apparent, and counsel for the defendant concede, that she was in some way killed by coming in contact with one of the trains of the defendant company."

The open question is, therefore, whether there was any evidence upon which the jury could find that her death was caused by engine No. 24. The testimony, including the circumstance of the watch stopping at 11:50, tends to show that a north-bound train passed through Turner that night before 12 o'clock, and that that train was extra No. 24. It is undisputed that the through freight passed at 12:14 a. m., and the regular passenger train at 1:10 a. m., about one hour behind its schedule time. In all probability the deceased was not struck by the regular passenger train, because the body was found by the baggageman and passengers immediately after the train had stopped, and the testimony shows that the body was then cold, the doctor testifying that death was only recent, "within an hour or two at least." When the freight train passed through Turner, it is undisputed that the headlight was burning and threw a reflection down

the track 300 or 400 feet.   The engineer and fireman were in their proper places, and both testify that they saw nothing unusual.   We think that the evidence presented a question for the jury.   In our opinion the instant case is clearly distinguishable from those involving two possible causes of an accident, one of which would charge the defendant with negligence and the other would not.

4. The question is raised whether lights were kept at this station in compliance with the provisions of section 13*a* of Act No. 300, Pub. Acts 1909 (3 How. Stat. [2d Ed.] § 6536).   The trial court eliminated this question from the consideration of the jury upon the ground of waiver by plaintiff's decedent; and therefore it is not necessary to discuss it here.   The jury were permitted to consider the appearance of the premises only in connection with the degree of care to be exercised by the train crew in backing its engine by the station without a headlight.   It seems to have been submitted for their consideration the same as any other fact relating to the surrounding conditions, such as the location of the station, the position of the box car, the view of the track, etc. The charge was so favorable to the defendant upon this branch of the case that it cannot here be complained of.

5. The measure of damages.   It is claimed by appellant that the court erred in instructing the jury respecting intestate's duty to her parents and sister, and contributions to them.   The only testimony in the case relative to intestate's contributions to her parents and sister was given by Lillian M. Richardson, sister, and William A. Barhite, the father.   The intestate was 37 years of age at the time of her death, a school teacher earning a salary of $60 per month, teaching a country school, and she also had conducted a normal school at Hillman.   Her father was 70 years

of age, in poor health, her mother was 61 years of age, and had been an invalid for years, and her sister, Myrtle, was an invalid 36 years of age. The sister testified that plaintiff's decedent had been contributing $40 per month during the school year of nine months, and for the other three months she contributed $15 or $20. Both intestate's sister and father testified that she had contributed to the support of her father, mother, and sister for 20 years before her death. There was no evidence that the parents and invalid sister were indigent and dependent upon the public for support; nor did the testimony show that, had intestate not rendered the support she did, they would have become a burden upon the public.

The learned trial judge, in charging the jury with respect to the damages plaintiff was entitled to in case of a verdict in his favor, used the following language, which has been made the basis of assignments of error:

"Evidence has been submitted here that she was in the habit during her lifetime of contributing to the support of her father and mother and sister, and that those people have lost by her death. Now, if they have, the law permits a recovery for it. It is the duty of a child, I don't care how old they are—this girl was about 36 or 37 years old—it is their duty if they have a father or mother that is getting old, or an infirm sister, it is their duty under the law to aid them. And this girl, if she was doing that, deserves a great deal of credit for it. And, if you find that they lost money on account of her death in their means of support, then the law requires this company to compensate them for it, providing, as I say, that you find that they are liable under the instructions that I have given you. * * * "

"The law, of course, is to compensate, to make good; it is not to punish anybody. The purpose of this case is simply to give compensation to the father and mother and sister for the loss that they have sustained financially because they have lost a daughter

or sister. You are not punishing the company; you are not to give them damages on account of their feelings or anything of that kind, but simply because they have lost money. Their claim is that she contributed and gave them something towards their support and maintenance every year, and they are not going to get that any more; they need it for their support and maintenance. If you find that is true, the plaintiff is entitled to recover for their use and benefit such sum as you find will compensate. them for that loss."

"Now, you have heard the evidence as to the age of the father and as to the age of the mother and as to the age of the sister. You have heard that they are all infirm and all ill. Now, you should take that into consideration. They are not entitled to recover anything, of course, after their death. They are only entitled to recover such sums as they would have lost during their lifetime. You should exercise the utmost good care in estimating that amount, because all you can do is estimate it."

"Another thing about it: Had she lived, she would have paid them those sums of money every year—as a matter of law we figure them up by the year as a rule. Now, you are going to give them such sum as you allow in a lump sum.   *   *   * "

"Now, gentlemen of the jury, your verdict in this case, if you find for the plaintiff, if you find that he is entitled to recover, will be such damages, as I have said, as you may find will compensate these relatives for the financial loss that they have sustained by reason of the death of this daughter and sister, under the instructions I have given you."

Section 6309, 2 Comp. Laws (3 How. Stat. [2d Ed.] § 6664), reads as follows: .

"Every such action shall be brought by and in the names of the personal representatives of such deceased person, and the amount recovered in any such action shall be distributed to the persons, and in the proportion provided by law in relation to the distribution of personal property left by persons dying intestate; and in every such action the jury may give such amount of damages as they shall deem fair and

just, to the persons who may be entitled to such damages when recovered."

This court held in *Van Brunt* v. *Railroad Co.*, 78 Mich. 530 (44 N. W. 321), that under this statute and the preceding section none of the next of kin could recover unless they showed a pecuniary loss on account of the person killed; and if, as in that case, the proof showed no person pecuniarily injured by the death of plaintiff's intestate, there could be no recovery. It will be noted that in the section above quoted it is provided that—

"The amount recovered in any such action shall be distributed to the persons, and in the proportion provided by law in relation to the distribution of personal property left by persons dying intestate."

Under the provisions of Act No. 116 of the Public Acts of 1899 (4 How. Stat. [2d Ed.] § 11038), providing for the distribution of the estates of intestates, it is provided that the residue of personal estates shall be distributed in the same proportions, and to the same persons, and for the same purposes, as prescribed for the descent and disposition of real estate. And by Act No. 286, Pub. Acts 1909 (4 How. Stat. [2d Ed.] § 10959), it is provided that if the intestate shall leave no issue, husband or widow, his or her real estate shall descend to the father and mother in equal shares, and, if there be but one of the parents living, then to the survivor alone. We have looked in vain for any authority to support that part of the charge of the court referring to the legal duty of plaintiff's decedent to aid in the support of her sister. There is nothing in the statute relating to the support of poor persons by their relatives, requiring a person to support his brothers or sisters.

In *Richmond* v. *Railway Co.*, 87 Mich. 374 (49 N. W. 621), this court held that in an action against a railroad company, under the statute above quoted, for

the negligent killing of plaintiff's intestate, the damages were limited to the pecuniary injuries sustained by the persons entitled to share in the distribution of his personal estate, which distribution was governed by the statute existing at the time of the death of the intestate. In that case the deceased was an unmarried man, and his next of kin consisted of his mother and two brothers and two sisters. The deceased lived with his mother, as did his sister, Ella, who was an invalid. He was 30 years of age at the time of his death. He had contributed to the support of the family. The court instructed the jury as follows:

"If you find the plaintiff entitled to recover, he is entitled to recover damages to the extent of the pecuniary loss which the mother and next of kin of the deceased, Mr. Sherwood, have sustained by his death. This amount will be such an amount as the jury are able to say it is reasonably probable would have been contributed by the deceased to their support had he lived. The jury cannot go beyond the term of the expectancy of life of the deceased, which is shown by the tables to have been 35.33 years, and, in weighing the testimony as to the contributions which would have been likely to have been made to the mother of the deceased, the jury cannot extend these beyond the period of her expectancy of life, which is shown by the tables to have been 18.79 years. As to the testimony of contributions to the sister, these cannot be considered, except for the period after the probable decease of the mother, and, under the testimony, such contributions are said to have been included in the sum which was contributed to the family."

Justice MORSE, speaking for a majority of the court, held that under the holding in the *Van Brunt Case* damages in the case under consideration could only be recovered on account of the mother and sister Ella, as no pecuniary injury was shown as to the others by Sherwood's death; that the circuit court so limited it, and was correct in allowing no damages

to be computed on account of the sister until after the mother's death, as, under the testimony, these contributions to the sister were included in the contributions to the family. In that case it is worthy of note that the statute in force at the time of Sherwood's death differed from the present statute, in that it provided that the property in such a case as the one then under consideration should descend one-half to his mother, and the remainder in equal shares to the brothers and sisters. This difference makes the distinction between the two cases, and shows that in the instant case it was error to submit to the jury the question as to the contributions made to, or on behalf of, the sister. It has been frequently held in this State that the compensation provided by the statute is strictly pecuniary, and there can only be recovery for the benefit of the next of kin who are within the rule of distribution already alluded to.

Under the death act the jury may give such damages as they shall deem fair and just, with reference to the pecuniary injury resulting from the death, to the beneficiaries. Tiffany's Death by Wrongful Act (2d Ed.), p. 300. In *Rouse* v. *Railway,* 128 Mich. 149, 155 (87 N. W. 68, 70), it was said:

"The statute does not imply that damages and pecuniary loss necessarily flow from the negligent killing. * * * These damages must be limited to the pecuniary damage sustained by those legally entitled to support."

See, also, *Chicago, etc., R. Co.* v. *Bayfield,* 37 Mich. 205; *Cooper* v. *Railway Co.,* 66 Mich. 261 (33 N. W. 306, 11 Am. St. Rep. 482); *Staal* v. *Railroad Co., supra; Balch* v. *Railroad Co.,* 67 Mich. 394 (34 N. W. 884). Commendable as it may have been, had plaintiff's decedent been supporting or educating a niece or some other collateral relative and contributing annually for such purpose, it would hardly be

claimed that such person could be a beneficiary in the action brought by virtue of the statute in question. And this is just the difficulty that confronts us in this part of the charge. For such voluntary contributions as plaintiff's intestate saw fit to make to her sister there can be no cause of action or right of recovery. In the case of *Schadewald, Adm'r,* v. *Railway Co.,* 55 Wis. 569 (13 N. W. 458), an action was brought under a similar statute. The right of action, however, was there by statute for the benefit of the surviving husband or wife of the deceased. It was there held that in an action to recover damages in respect to the death of a person caused by the wrongful act or neglect of another, if the widow survive the deceased, the damages sustained by her alone are all that can be recovered under the statute. In that case the plaintiff in his declaration claimed damages to the widow and children of the deceased resulting from his death; and the jury there, as here, were instructed that such damages were recoverable in the action. The supreme court of Wisconsin said:

"This was error. Damages sustained by the widow alone are all that can be recovered under the statute."

See, also, *Regan, Adm'r,* v. *Railway,* 51 Wis. 599 (8 N. W. 292); Tiffany, Death by Wrongful Act, § 168 *et seq.*

We cannot agree with appellant's counsel that there can be no recovery in this case in so far as the father and mother are concerned, because action had not been taken under chapter 110, 2 Comp. Laws (2 How. Stat. [2d Ed.] § 3478 *et seq.*), relating to the support of poor persons by their relatives. Our attention has been called to the cases of *Clinton* v. *Laning,* 61 Mich. 355 (28 N. W. 125), and *Schwanz* v. *Wujek,* 163 Mich. 492 (128 N. W. 731). *Clinton* v. *Laning* was an action brought by a father in advanced years to recover damages from the defendants for his loss

by being compelled to support a grown-up son who, being given to drinking, became grossly drunk at defendant's tavern, and on his way home had his feet and hand badly frozen so as to render him to a great degree helpless.   There, although no statutory proceedings had been taken, the father had been supporting the son, and Chief Justice CAMPBELL said:

"We think that the voluntary assumption of this duty may fairly be regarded as performing a legal obligation, and that expenditures to a proper extent, within the limit which could be laid down by compulsion, are as valid charges as if they had been compelled, and may be considered as on a similar footing.

"But in making these outlays voluntarily, nothing can fairly be included as a payment by obligation beyond what might have been reasonably required in case of refusal."

And he proceeds to show that that rule had not been observed in that case.   The fact, if it be a fact, that plaintiff's decedent voluntarily assumed the performance of a duty which might be regarded as a legal obligation, and made expenditures to a proper extent, might form a basis for a recovery in this action in so far as the father and mother are concerned.   We think the instant case can readily be distinguished from *Schwanz* v. *Wujek, supra,* where an action was brought against a son to recover for an operation performed upon his father, in which the son had no part.

For the error pointed out in the charge relating to the claimed legal duty of the plaintiff's intestate to her sister, and her contributions to the sister, as a basis of recovery in this case, we feel constrained to reverse the judgment of the circuit court.   While there is no complaint urged here that the judgment is excessive, yet it is properly urged and claimed in the motion for a new trial, and covered by proper assignments of error, that the whole basis of the measure

of damages was erroneously given to the jury; and we cannot say that the error has not affected the judgment; nor are we able to state the amount the judgment has been enhanced by this erroneous part of the charge.

Judgment reversed, and a new trial ordered.

STEERE, C. J., and MOORE, McALVAY, BROOKE, KUHN, OSTRANDER, and BIRD, JJ., concurred.