RICE v. MICHIGAN RAILWAY CO.

1. CARRIERS—STREET RAILWAYS—DUTY TO INTENDED PASSENGER— NEGLIGENCE—QUESTION FOR JURY.

In an action for personal injuries, testimony by plaintiff that, intending to take defendant's interurban car, he went upon the platform at the small waiting room, signaled the car to stop, and was answered by a signal by the motorman, advising him that it would stop, that he stood near the edge of the platform expecting the car to stop, when, instead of doing so, it went by at a rate of speed of from 50 to 60 miles an hour, that he was caught

in the suction of the car and seriously injured, and by the motorman that no signal nor answer thereto were given, *held*, to present a question of fact for the jury as to defendant's negligence.

2. SAME—RELATION OF CARRIER AND PASSENGER—INTENDED PASSENGER.

It is the general rule that the relation of carrier and passenger commences when a person with the good-faith intention of taking passage, and with the express or implied consent of the carrier, places himself in a situation to avail himself of the facilities for transportation which the carrier offers.[1]

3. SAME—TRIAL—INSTRUCTIONS—DUTY OF CARRIER.

An instruction by the court that if the jury believed plaintiff's testimony, it was the duty of defendant in all ways to exercise a very high degree of care for his safety or protection in the operation of its car, *held*, not erroneous.

4. SAME—NEGLIGENCE—EVIDENCE—SUFFICIENCY.

Testimony *held*, sufficient to justify a finding by the jury that plaintiff was injured in the manner claimed by him, and that defendant's negligence was the proximate cause of his injury.

5. SAME—CONTRIBUTORY NEGLIGENCE—QUESTION OF FACT.

Where plaintiff was in a position of safety when he gave the signal to stop and received the answer thereto, had the car stopped as he had a right to expect it would, and he had but little time after discovering that it was not going to stop before it rushed by, it cannot be said, as a matter of law, that he was guilty of contributory negligence because he failed to step back or because he acted in a manner not afterwards found to be in the interest of his personal safety.

6. SAME—TRIAL—INSTRUCTIONS—THEORY OF DEFENSE.

An instruction by the court that if the jury found that plaintiff stood on the platform with an arm extended so close to the track that the car struck it and caused the accident, plaintiff would be guilty of contributory negligence and could not recover, *held*, to fairly present to the jury defendant's claim as to the cause of plaintiff's injury.

---

[1]For authorities discussing the question of effect of signaling car to make one a passenger are collated in notes in 13 L. R. A. (N. S.) 283; 25 L. R. A. (N. S.) 407; L. R. A. 1916C, 1022.

7 SAME—APPEAL AND ERROR—TRIAL—INSTRUCTIONS—ISSUES.

Where the charge of the court clearly submitted to the jury plaintiff's claim that the negligence complained of was the running of defendant's car past the platform at a high rate of speed after signaling an intention to stop, an objection that plaintiff's action was based on mere failure to stop for a passenger is untenable.

8. APPEAL AND ERROR—TRIAL—INSTRUCTIONS—CHARGE AS WHOLE.

The charge should be considered as a whole, and the portion objected to should be read and considered in connection with all other portions of the charge given bearing upon the same subject.

9. CARRIERS—APPEAL AND ERROR—TRIAL—INSTRUCTIONS — CHARGE AS WHOLE.

The giving of plaintiff's requested instruction as to defendant's duty to a passenger, stating a broad proposition of law applicable to such cases, but making no application to the particular facts, while unfortunate, *held*, not prejudicial, in view of the fact that in other portions of the charge the court properly instructed the jury as to the duty defendant owed to plaintiff as an intended passenger.

10. APPEAL AND ERROR—REFUSAL TO GIVE REQUESTS COVERED IN CHARGE.

Refusal of the court to give certain requests proffered by defendant, which might well have been given, but which merely stated negative propositions whose force and effect were fairly covered in the charge as given, *held*, not erroneous.

11. TRIAL—ARGUMENT OF COUNSEL.

Although plaintiff's counsel, in his argument to the jury, discussed matters which the court later in his charge withheld from their consideration, this court will assume that the jury realized it was their duty to be governed by the instructions of the court as to the law and not by the argument of counsel, where it appears that defendant was not prejudiced.

12. NEW TRIAL—OVERWHELMING WEIGHT OF EVIDENCE.

The verdict of the jury in favor of plaintiff *held*, not so overwhelmingly against the weight of the evidence as to call for a new trial.

13. DAMAGES—EXCESSIVE VERDICT—PERSONAL INJURIES.

A verdict for $13,800, *held*, not excessive on a showing that plaintiff received serious and painful injuries which are permanent, that his usefulness as a physician is impaired, that he will never be able to do any surgical work, that at the time of his injury he was 52 years old, that his income previous to his injury was more than $300 a month, that he was unable to practice for eight and one-half months, and was confined to bed for eight weeks.[1]

Error to Shiawassee; Collins (Joseph H.), J. Submitted October 16, 1919. (Docket No. 57.) Decided December 22, 1919. Rehearing denied April 10, 1920.

Case by L. Frank Rice against the Michigan Railway Company for personal injuries. Judgment for plaintiff. Defendant brings error. Affirmed.

*Sanford W. Ladd* and *Justin R. Whiting (Warren, Cady, Ladd & Hill,* of counsel), for appellant.

*Neil R. Walsh Albert L. Chandler,* and *O. J. Hood,* for appellee.

SHARPE, J. The plaintiff, a practicing physician residing in Owosso, took defendant's car on the evening of February 16, 1917, to visit a patient several miles distant. About eight o'clock, he returned to the point where defendant's road crosses the highway known as the Grand River road, where a small waiting room, with platform in front, had been theretofore constructed. He knew that a through car on defendant's line would pass there about that hour, and that it would stop for passengers on being signaled. It is his claim that as the car approached the crossing from the south, and when about 35 rods distant, he signaled it to stop by waving his arm; that the car did not stop, but passed by at a speed of from 50 to 60 miles per hour; that, expecting it to slacken and stop, he stood near the edge of the platform and

---

[1] On excessiveness of verdicts in actions for personal injuries other than death, see comprehensive note in L. R. A. 1915F, 30.

was caught in some way by the suction of air, thrown against the building and then the car, and badly injured.

The defendant moved for a directed verdict at the close of the plaintiff's case and also at the conclusion of the testimony. These motions were denied. The plaintiff had verdict and judgment for $13,800, and the defendant appeals. While there are 92 assignments of error, the defendant's counsel discuss them under the following heads:

(1) No negligence on the part of the defendant was proven and a verdict should have been directed in its favor.

(2) The plaintiff was guilty of contributory negligence.

(3) Error in the charge of the court.

(4) Error in the argument of plaintiff's counsel.

(5) Defendant's motion for a new trial should have been granted.

These will be considered in the order stated.

1. The claim of negligence as submitted by the court in its charge to the jury was as follows:

"3. Plaintiff further claims that while he was standing on the platform he noticed the headlight of a car coming from the south towards Owosso, and that when the car was some thirty-five or forty rods south of the station building, he signaled it by waving his hand, and that thereupon, the motorman of the car responded by blowing two short blasts of the whistle on the car. That the car did not stop at the station, but passed by at a high rate of speed, coming so close to the plaintiff that the suction and the wind caused by the passing of the car, caught the overcoat and clothing of the plaintiff, and threw him from the position where he stood, over to and against the car, and by reason thereof, he was seriously injured. And he further claims that at the time of such accident, he was guilty of no negligence which contributed to the injury, but was acting with due care and reasonable precaution. *   *   *

"9. I further charge you in this case that if you should find upon the night in question that the plaintiff signaled for the car to stop and that the motorman answered such signal with the usual answer of two short blasts of the whistle, then I charge you it was the duty of the defendant to have slowed down the car and brought it to a stop at the platform of the station so that plaintiff could have safely had access thereto; and if you should find that defendant did not do this, then it would be guilty of negligence and plaintiff would be entitled to recover; if you should further find that defendant's failure to slow down the car was the proximate cause of the accident and that plaintiff himself was free from any negligence that contributed to the injury."

He also gave plaintiff's request to charge as follows:

"14. In this case, I charge you that if you believe from the evidence that on the 16th of February, 1917, the plaintiff in good faith came to the depot of the defendant and upon the platform of the defendant for the purpose of taking said car for passage to the city of Owosso; that at that time and place that he signaled the defendant's trainman when about four hundred feet or more away, and that said trainman answered said plaintiff's signal for the purpose of accepting him as a passenger, then I charge you that plaintiff then and there became a passenger and it was the duty of the defendant in all ways to exercise a very high degree of care for his safety or protection in the operation of the car and the maintenance of its road, and in deciding whether or not the defendant performed that duty you have a right to consider the lighting of the platform, the rate of speed the car was running at the time of the accident and all the surroundings at the place of the accident, and if you find that the defendant violated its duty to render that high degree of care for the plaintiff that an ordinarily prudent person engaged in the same kind of business would have done under the same or similar circumstances and conditions, then I charge you that the defendant is guilty of negligence and the plaintiff is entitled to recover."

It is conceded that the car in question should have stopped at this way station if signaled to do so; that no particular kind of signal was required; that anything which apprised the motorman that a person was waiting to take the car was sufficient, and that two short blasts of the whistle was the customary way in which notice would be given that the signal had been observed and that the car would stop. The waiting room was a small frame building, about 9 by 10 feet, and between it and the tracks of defendant was a platform about 5 feet wide, the outer edge of which was about 3 feet from the nearest rail of defendant's track. There is a step leading to the platform from the south end. On the night in question, there was no light in the waiting room or on the platform. Plaintiff testified that the night was cold and he was wearing a heavy fur overcoat; that he had his medicine case under his right arm; that he was familiar with the surroundings, having often taken a car there; that after he had given the signal by waving his left arm, and heard the answer thereto, he stood near the edge of the platform, expecting the car to stop; that when it passed it was going at the rate of 50 or 60 miles per hour; that—

"the wind or the suction or whatever you call it, made a regular top of me. I was facing the south there, and it whirled me right into that car, into the side of the car, towards the latter end of it. Now, that is just what took place."

He was asked: "Q. To what extent was there a suction from that car when it went by there?" and answered, "A. Why, it was terrific, I call it." His shoe was torn from his left foot and the heel partly ground up. Defendant's motorman denied that he saw any signal given or that he answered it, as claimed by plaintiff, and he testified that when the car was about

208—Mich.—9.

20 feet from the plaintiff he saw a man's hand go up, that the car hit it, and that he stopped as soon as he could do so and within 800 or 900 feet. He says the car was traveling at about 45 miles per hour. The conflict in the testimony of the plaintiff and the motorman as to the giving of the signal and the answer thereto presented questions of fact for the jury, and under the instructions given, in view of the verdict rendered, must be considered as having been determined in plaintiff's favor. In the further consideration of the errors assigned, we may therefore treat these facts as established by the proofs.

There was considerable evidence offered on both sides as to the effect of the suction of air produced by a rapidly moving car on a person standing within a few feet of it. George Cook, a farmer who lived near the crossing, said:

"*Q.* Witness, have you stood by one of those street cars that was passing rapidly by on that track, to notice whether there was a suction to that car when the car went by?

"*Mr. Whiting:* I desire to object to that unless it is given more in detail, what the car was and what the conditions were.

"Question read.

"*The Court:* He may answer.

"*A.* Why, I have stood near them at times. I have a front gate, when I lived there to the crossing, that went from the yard out over the railroad into the highway. It is very close to the gate. It is so close, really, that we never allowed it to be swung except the one way, in, and probably within 4 or 5 feet of the track, just a little ways.

"*Q.* How do you describe the suction to any of those cars that are going through from 30 to 40 miles an hour?

"*Mr. Whiting:* I desire to have my same objection.

"*The Court:* Very well.

"*Mr. Whiting:* To all of this line of testimony, incompetent and irrelevant.

"*A.* There is a draft, a suction. The conductor sometimes, or motorman, would throw paper off at times, used to give me an evening paper sometimes when he would have one. I have had them drop a little short of the mark and roll along after the car, you know, as it would be going along at a rapid rate and there is a great suction there."

Defendant's general superintendent, Clinton E. Morgan, testified as to certain experiments that had been made as to the force and effect of such suction; that the general direction of the air force produced by the car is away from it, that it leaves an air pocket or vacuum behind the car, and that he had never seen a person or object sucked into the side of a single motor car. On cross-examination he testified:

"*Q.* What would be the effect of this air current you speak of, this outward current, if a building 8 by 10 and 8 feet high, were placed in the path of this air current?

"*A.* It would have a tendency to shove the building over. * * *

"*Q.* If it didn't blow it away, what would be the effect?

"*A.* When the car went back, that is, went by, the vacuum behind would have a tendency to kind of pull it in towards the track. * * * I have tried several means of measuring that vacuum behind the car, but I haven't been able to find a contraption to measure that air behind there. You can't catch it. It is there, there is a vacuum there. You have got to have something to pass that air through. * * *

"*Q.* * * * Isn't it true, if a man had on a big overcoat and standing there when the car, we will say—suppose he was standing to the south, in this way, and the car comes by, and he has on this big fur overcoat, standing there, and when the head of the car comes by and that current of air came around the corner of that car, would you not think that there would be a heavy pressure on the man standing there?

"*A.* It would shake him a little bit.

"*Q.* Shake him a good deal, wouldn't it?

"*A.* Not much."

R. C. Taylor, the superintendent of equipment of the defendant company and a mechanical engineer of many years' experience, was called by defendant. He testified as to the improbability of the plaintiff receiving his injuries in the manner claimed by him. His testimony differed greatly from Mr. Morgan's in his estimate of the air pressure produced by a rapidly moving car. In the course of his examination he said:

"I should think if a car was going 66 feet in less than a second and a hard substance of the car came in contact with a hand held out, that the impact would cause some mark on the hand if it impinged against the car, it would make a scratch, bruise or mark, or even break it off. I would think it would make a mark. * * * It is impossible to give any description of what occurred, so as to swing him around to such an extent so as to throw his feet under the car, but it is quite conceivable how it could be done. I have seen it done in other cases. I have seen it done upon the western division of the Michigan Railway. There a lady held her hand out in front of the car. It rolled her all over the place. I mean, it threw her down, rolled her down a bank, rolled her over two or three times, and she only got hit in the hand, and it didn't break her hand, and the car was going 80 miles an hour. It marked her hand, but it didn't break it. It didn't break her hand. That is the only instance like that that I know of personally."

That the passing of a car, going at a high rate of speed, will create some considerable disturbance in the air, and thus affect a person standing near it, is apparent from the testimony. This court, in *Richardson* v. *Railway Co.*, 176 Mich. 413, seemed to take judicial notice that a suction would be created by the passing of a train of cars and that the effect thereof might be sufficient to draw the skirts of a woman standing near by into the wheels of the train. At page 423, it is said:

"If this train was running at the rate of speed claimed for it by plaintiff's witnesses, it is apparent

that the suction from the rapid motion of the train may have drawn the skirts of decedent into the driving wheel, or machinery, causing the marks or grease spots described upon her clothing, and tearing her clothing from her hips, and winding it around her feet, as described by the doctor. This might draw her legs into the machinery, and may have severed the one and broken the other, as described."

The facts in *Great Falls, etc., R. Co.* v. *Hammerly,* 40 App. Cas. D. C. 196, were quite similar. In the statement of facts it is said:

"Between 9 and 10 o'clock at night she (plaintiff) was upon the station platform waiting to board a car. She saw one approaching, heard it whistle, stepped towards the front of the platform, * * * and waved her hand for the car to stop, but it did not; 'that it turned her around and she fell,' and one of her feet was struck by the car. * * * The whistle did not sound as the car reached the platform, and there was nothing to indicate that the car would not stop. There was evidence that it was going very fast, and that its speed did not lessen as it passed the station. When it was about 50 or 100 feet distant, plaintiff realized it would not stop 'as it was running too fast'; did not then change her position, because 'you wouldn't have time to think, much less move.' "

In the opinion written by Mr. Justice Robb and concurred in by the other Justices it was held:

"In the present case we think the question of the defendant's negligence and of the plaintiff's contributory negligence was clear for the jury to determine. The plaintiff desired to take the car, and, to effect that purpose, it was necessary for her to signal it to stop. There was nothing to indicate to her that her signal would not be effective; in other words, she had no reason to believe, when she stepped towards the front of the platform, that the car would not respond to her signal. Whether the conductor was legally bound to stop we need not determine, since it is sufficient for the purposes of this case that plaintiff had reason to believe he would. Having reason to believe the con-

ductor would respond to her signal, she was justified in assuming a position which she would not otherwise have been justified in assuming. The evidence was to the effect that she at no time voluntarily placed herself sufficiently near the edge of the platform to be struck by the car. This leads to the further observation that under the evidence it was competent for the jury to find that the speed of the car as it passed the station was the cause of the plaintiff's fall and consequent injury. It was well known to the defendant that prospective passengers would assemble at its suburban stations in the expectation of boarding its cars. Knowing this, did it fulfill its obligation to such prospective passengers who, as we have previously suggested, were then constructively in its care, when it not only failed to stop its car in response to their signal, but rushed that car by the station as fast as it could go? We think not. Having impliedly invited prospective passengers to assemble upon its platform, and having given such prospective passengers reason to believe its cars would be stopped upon their signal, it was clearly its duty in passing such a point to take such reasonable precautions as would, in the circumstances, properly insure their protection. The rule applicable to express trains that stop at scheduled points only has no relation to an electric railway car that is supposed to stop at all stations if signaled. It might constitute contributory negligence for a prospective passenger to place himself so near the edge of the platform of a station at which an express train was not scheduled to stop, as to be affected by the passing of such train, while such passenger would be justified in assuming the same position for the purpose of signaling an approaching electric car that was expected to stop.

"In the present case the evidence is to the effect that the signal was given in ample time to have permitted the stopping of the car. The plaintiff was in a position of safety, had the car either stopped or passed at a reasonable rate of speed. When the car was within 50 or 100 feet of her, she realized it would not stop because 'it was running too fast.' It is urged that she was negligent in failing immediately to step back. Assuming that the car was going 50 miles an

hour, and we think the jury would have been warranted in finding that to have been its speed, it was going 73 1/3 feet a second. Plaintiff fixed the distance of the car from her when she realized it would not stop at about 50 or 100 feet. It is apparent, therefore, that only about a second of time interposed between her realization that the car would not stop and the accident. To say that a women weighing nearly 200 pounds, situated as she was, startled as she may have been,—indeed as she says she was,—was guilty of contributory negligence because she permitted a second to elapse without getting out of the way, would be to usurp the functions of the jury. Clearly, it was for them to decide, as practical men, whether plaintiff's conduct was not natural and reasonable."

While we do not assent to all that is said as to the plaintiff being a passenger (a question later discussed herein), we are in accord with the reasoning of the court on the question of the contributory negligence of the plaintiff. See, also, *Trieber* v. *Railway Co.,* 134 App. Div. 661 (119 N. Y. Supp. 439).

It also seems apparent that the effect of such disturbance of the air on a man would be increased if he stood in a narrow space between a building and the passing car, as was the case here. The plaintiff testified positively that his injury was produced in that way, and we cannot find from the proofs, or from anything of which we may take judicial notice, that it was physically impossible to so occur.

Was the plaintiff constructively a passenger and did the defendant owe him a duty as such? Error in the court so holding is also discussed by counsel in his criticism of the charge of the court. We dispose of it here. We do not find that this court has passed upon the question as here presented. Assuming the facts to be as plaintiff testified, and as the jury found, we find him upon the platform at the waiting room maintained by the defendant for the accommodation of persons desiring to take passage on its cars, in-

tending to board this car. On its approach he gave a signal for it to stop, which was answered in the usual way and which advised him that his signal had been observed and that the car would stop. The motorman then knew that an intended passenger was on the platform and it was his duty to so run the car past the platform as not to needlessly expose him to danger. We believe that duty is fairly expressed by defining it as that high degree of care to which a passenger is entitled. The rule is clearly stated in 6 Cyc. p. 536 *et seq.*:

"The relation of carrier and passenger commences when a person with the good-faith intention of taking passage, and with the express or implied consent of the carrier, places himself in a situation to avail himself of the facilities for transportation which the carrier offers. In case of a railroad this relation arises not merely when the passenger enters the train with the ticket already purchased, giving him a contract right to ride, but when he enters upon the premises of the carrier, with intention to take a train in due course. But one who is about the carrier's premises, without intent to be transported in due course, or after the abandonment of such intent, is not a passenger. One who enters upon the premises or takes passage on the train of a railway, with intent to become a passenger, but by mistake as to the proper place or proper train is not, by reason of such mistake itself, precluded from the rights of a passenger.
\* \* \*

"To give rise to the relation of passenger and carrier there must be not only an intent on the part of the former to avail himself of the facilities of the latter for transportation, but also an express or implied acceptance by the latter of the former as a passenger. Until there is an acceptance, that is, until with the express or implied knowledge of the carrier or his employees the person seeking to become a passenger has indicated his intention to become a passenger, which intention has been in some way acquiesced in, at least to the extent of not refusing transportation, the relation does

not arise, even though the purpose of the person attempting to become a passenger is to pay fare when required. But just as there may be sufficient intent to become a passenger before transportation actually commences, so there may be an implied acceptance as to persons seeking transportation before they have entered into the train or other conveyance and it has started toward its destination. Those who by express or implied assent are waiting in the passenger room or in a standing car, for the departure of a train, or are crossing the premises of the carrier for the purpose of going upon a train, or are in the act of mounting the car steps, are passengers, provided their acts are such as are presumed to be known and assented to by the agents of the railroad company having authority in the matter, and regardless of whether or not a ticket has been purchased, if no rule or regulation of the company is being violated. But the mere fact of intention to go on board a car, which intention has not been, by acts or otherwise, indicated to the servants of the railroad company, does not render the person having such intention a passenger, although he may be entitled to transportation. It matters not that the person gets on board a train at an unusual or unauthorized place; if he is entitled to transportation he becomes a passenger from the time he gets on board the train."

The rule thus stated is abundantly supported by the authorities from other jurisdictions cited in the annotation to the text. The cases cited by defendant's counsel (*Georgia, etc., R. Co.* v. *Tapley*, 144 Ga. 453 [87 S. E. 473, L. R. A. 1916C, 1020]) are easily distinguishable. In these cases there was no acceptance, express or implied, of plaintiff as a passenger. To complete the relation, there must be an intent on the part of the passenger to take passage; a communication of such intent to the carrier, and an express or implied acceptance by the latter. *Brott* v. *Railroad Co.*, 220 N. Y. 92 (115 N. E. 273). In our opinion, there was sufficient testimony, in view of the surrounding circumstances, to justify a finding by the

jury that plaintiff sustained the injury in the manner claimed by him, and, if he did, we are of the opinion that the jury was also justified in finding that such negligence was the proximate cause of his injury.

2. Contributory negligence. It is the defendant's claim that plaintiff was guilty of contributory negligence, and that such fact is established by his failure to move back a few feet when the car was approaching. After the plaintiff had given the signal to stop and had received the answer thereto, he was in a position of perfect safety, even were he standing by the edge of the platform, had the car stopped as he had the right to expect it to do. A car traveling 45 miles an hour will pass over more than 65 feet each second. So that, between the time that he would have discovered that it did not intend to stop and the time it rushed by, he would have little time to act or even think of the danger in which he was placed. He could not but be confused and if, under the circumstances, he failed to step back, or acted in a manner which in cool deliberation we might find not to be in the interest of his personal safety, we do not think it can be said as a matter of law that he was thereby guilty of negligence which contributed to his injury.

The duty of a person about to take a train, or one who has business with a train about to stop at a flag station, is well stated in *Tubbs* v. *Railroad Co.*, 107 Mich. 108. We quote from page 115:

"We cannot say, as a matter of law, that persons having business with a train at a way station, at which the stop is but momentary, are guilty of negligence in not waiting until the train comes to a standstill. It is a fact open to every day observation that those awaiting the arrival of a train do not wait until the train stops, but, on the contrary, as the train approaches, those having business with the train take their position near the track, and wait for the train to come to a standstill. Indeed, this custom is so gen-

eral that it must be within the knowledge of those operating trains."

The court instructed the jury that if the plaintiff stood on the platform with an arm extended so close to the track that the car struck it and caused the accident, the plaintiff would be guilty of contributory negligence and could not recover. This instruction fairly presented the claim of defendant as to the cause of plaintiff's injury. The determination of this question of fact was for the jury. *Great Falls, etc., R. Co.* v. *Hammerly, supra.*

3. Charge of the court. These errors are largely based on the claim of defendant "that mere failure to stop a car for a passenger is not negligence upon which a personal injury action can be predicated." The instructions of the court heretofore quoted show clearly that the negligence of the defendant was not predicated on any such claim. Under the charge as given, recovery was not had by reason only of the negligence of the defendant in its failure to stop the car, but in its running its car past the platform at a high rate of speed after it had advised the plaintiff by an answer to his signal that it would stop.

Complaint is made of the following instruction, given at plaintiff's request:

"13. In this case, I charge you that the defendant is a common carrier of passengers for hire and that having accepted a passenger for transportation the defendant owes such passenger a duty to use the highest degree of care for his protection and safety consistent with the reasonable operation of its business; that this high degree of care should be exercised by defendant from the time that the passenger in good faith enters into the buildings, platforms and premises of the defendant for the purpose of entering said cars as a passenger, and which duty also includes a high degree of care to keep the platforms in a safe condition, keep them lighted when necessary, provide means of signaling a car when necessary and to run

its car at and by said station in such a manner as to observe a very high degree of care for the protection and safety of such passengers."

As to this instruction, defendant's counsel say in their brief:

"By this paragraph of the charge it is assumed that the plaintiff was a passenger, while in other paragraphs of the charge it is stated that he is not a passenger unless the jury believe that he signaled the car as testified to, and that the motorman answered the signal by two short blasts of the whistle. One or the other is erroneous.

"This place where the accident occurred was merely at a country crossing; there was no agent there; no tickets sold; no heat provided; merely a shelter where passengers might wait before signaling a car. No one would contend that plaintiff when he appeared there became a passenger before he signaled a car. We submit, that he does not become a passenger then. But assuming, for argument's sake, that he does, this was a question for the jury. The motorman had testified that he gave no signal, and none of the other witnesses heard the two short blasts of the whistle. Yet, paragraph 13, of the charge, presupposes that defendant had accepted him, and lays down a rule as to the duty."

They concede that in other portions of the charge the court properly instructed the jury as to the duty the defendant owed plaintiff as an intended passenger and that he only became such in case the jury found that he had given the necessary signal and the motorman had answered in the usual way. They insist, however, that under the rule many times stated by this court—

"Where a charge contains two conflicting portions, one of which is correct and the other incorrect, it will be presumed on appeal that the jury followed the erroneous portion." *Bayne* v. *Everham*, 197 Mich. 181.

See, also, *Rathbone* v. *Railway*, 187 Mich. 586.

While the language employed was unfortunate, we cannot believe, in view of the other portions of the charge, that the jury could have been in any way influenced by it. It did not instruct them that the plaintiff was a passenger. It in no way applied the instruction to the particular facts, but stated a somewhat broad proposition of law applicable to such cases. Besides the rule above stated on which defendant relies, it has also been said:

"This court has frequently laid down the rule that the charge of a trial court to the jury in a given case should be considered as a whole, and that the portion objected to should be read and considered in connection with all other portions of the charge given bearing upon the same subject." *Marshall* v. *Railroad Co.*, 184 Mich. 601.

The other errors complained of relate to the refusal of the court to give certain requests proffered by defendant. While they might well have been given, they merely stated negative propositions and their force and effect were fairly covered in the charge as given.

4. Argument of plaintiff's counsel. The argument of both of plaintiff's counsel is inserted in full in the record. As is not unusual in such cases, there was much said by them which should have been omitted. It is apparent that at the time of the argument the court had not intimated to counsel the manner in which he would submit plaintiff's claim to the jury. They were thus required to anticipate his instructions, and consequently discussed matters which under the charge as given were not to be considered by the jury. We must assume that the members of the jury were intelligent men; bent on deciding the case fairly between the parties; that they realized it was their duty to be governed by the instruction of the court as to the

law, and not by the argument of counsel. Without alluding to the particular errors pointed out, we are of opinion that the jury were not improperly influenced or swayed to defendant's prejudice by such arguments.

5. Weight of the evidence. Should a new trial have been granted to defendant because the verdict was contrary to the weight of the evidence? This question having been properly raised on the motion for a new trial, it becomes our duty to examine the testimony to determine whether or not the verdict is so overwhelmingly against the weight of the evidence as, in justice to the defendant, to call for a new trial. *In re McIntyre's Estate,* 160 Mich. 117.

The plaintiff's testimony as to the cause of his injury was uncorroborated except as the surroundings may have given it support. Uncontradicted, it would not, in our opinion, appear unreasonable or even improbable. His right of recovery depended upon his establishing the fact that he had given the signal and that it was responded to by the motorman. He was at the flag station to take the car, and knew he must signal to have it stop. While contradicted by the motorman and by Conductor Southwell as to the answering signal having been given, if but this testimony be considered we would find no justification for disturbing the verdict for that reason.

It is insisted that plaintiff's testimony as to the manner in which he sustained his injuries is so flatly contradicted by the statements he made soon after the occurrence as should have caused the jury to disregard it or, in any event, should entitle defendant to a new trial. It is claimed that such statements should be taken as admissions on his part and that they clearly show that his injury was caused by his right arm having been struck by the car.

We have made a careful examination of the testi-

mony relied on to support this claim. Dr. Hume, who was on the car at the time of plaintiff's injury, testified on cross-examination by defendant's counsel as follows:

"*Q.* He told you he was signaling the car with his right arm—hand, didn't he?

"*A.* I wouldn't say positively that he said that, but my recollection is that he told me he was signaling the car. Now, he might have said with his right hand. I wouldn't swear positively."

Dr. Arnold, a surgeon employed by the defendant, who assisted Dr. Hume in reducing the fractures in plaintiff's arm and leg, was called by plaintiff to testify to his injuries. On cross-examination by defendant's counsel, he said:

"*Q.* And did you ask him what had happened, how the accident had occurred, or did he tell you?

"*A.* Yes, we talked it over in a way.

"*Q.* Did he tell you he was standing on the platform and attempted to flag a car by waving his right hand and that he misjudged the distance of the car and the car struck his right arm, whirling him around?

"*A.* I don't know as he specified his right arm, but he was flagging—the impression I got from his conversation was, he was flagging the car.

"*Q.* Yes.

"*A.* And the car struck his arm.

"*Q.* The car struck his arm?

"*A.* And whirled him around."

He was afterwards shown a report he had made to the company, and, after refreshing his recollection by reading it, he was asked:

"*Q.* What will you say whether or not he told you he was signaling with his right or left arm?

"*A.* Well, with his right arm.

"*Q.* Right arm? And that he misjudged the distance and the car struck his right arm?

"*A.* That was my impression."

Benjamin Kleinstiver, the claim agent of the de-

fendant, went with Dr. Arnold to plaintiff's home on the 20th, four days after his injury. He testified that while there, and after the doctor had left, the plaintiff told him that he signaled the car to stop with his right arm and that it was hit by the car. On cross-examination by plaintiff's counsel, he said:

"I wouldn't say which it was, right arm or hand, that he said which it was, either the right arm or hand. But the right arm was broken and he was whirled around and was thrown to the platform, or onto the platform, and he couldn't tell how or in what manner his left leg or foot was injured. He also told me that when the car was about 40 rods away, he began to signal; that the headlight was burning, and burning bright. As I recall it, he said he commenced to signal about 40 rods; he thought the car was about 40 rods away."

The deposition of Robert W. Bell, of Columbus, Ohio, who was on the car, had been taken. In it he testified:

"The injured man stated that when the car came along he stepped out from the little storm building there that they might see him, and when he found they were not going to see him, why he attempted to touch the car with his medicine case, and he expects he must have got a little nearer than he thought he was, and the car hit him on the arm and knocked him off the platform, or pushed him off the platform—he didn't know just how he got in that position, or how he fell that his leg got under him. I do not know how his arm was hurt. When the injured man made these statements there were two men, another doctor, and two ladies and myself present."

He further said that the car approached the station at the rate of 8 or 10 miles an hour, and that it was stopped within 75 yards of the station.

The other three witnesses, whom defendant relies on, all of whom were on the car, testified that the plaintiff said "he didn't think the car was so close to him."

It may be observed that the witness Kleinstiver was contradicted by plaintiff and his wife and his daughter, all of whom testified that no such statement was made while the witness was at plaintiff's home. Mr. Bell's recollection differs from that of all others on the facts. It is significant that he estimated the speed at which the car was running at 8 or 10 miles an hour while the motorman believed that he was running 45, and that, in his judgment, the car stopped within 225 feet while the motorman fixed the distance at 800 or 900 feet.

A fair consideration of all this testimony does not, in our opinion, require us to overrule the finding of the jury as to the weight of the evidence. It is not suggested that plaintiff voluntarily placed himself in a position of danger. This car, running at 45 miles per hour, would, as before stated, travel more than 65 feet per second. If the plaintiff had a right to expect it to stop, the time which would elapse between his discovery that it would not and its passing the plaintiff would be brief indeed; and his recollection of what he did in that time might well be hazy and imperfect. As the only purpose of this contradictory. evidence is to show admissions on plaintiff's part as to where he was and what he did at the precise moment the car passed, we do not feel that it so affects the real question at issue as to entitle defendant to a new trial for the reason claimed.

Was the verdict rendered excessive? The injuries sustained by plaintiff were serious and painful. He was confined to his bed for 8 weeks. After a time he was able to go about on crutches, but was unable to resume his practice for 8½ months. His right forearm was fractured, both bones having been broken, and his right wrist partly stiffened so as to greatly impair the use of his arm. Both bones of the left

leg, near the ankle, were fractured. This joint is stiffened, and will always remain so. The leg is shortened about one and one-half inches. The surgeons who examined plaintiff agree that his injuries are permanent and much impair his usefulness in the practice of his profession. He is now, and always will be, unable to do any surgical work. Plaintiff was 52 years of age at the time of his injuries. His income from his practice at that time was more than $300 per month. Under these facts, which are not in dispute, we do not feel called upon to interfere with the judgment of the jury as to the damages to which they found him entitled.

After a careful reading of the entire record, and giving due consideration to the several assignments of error alleged by defendant, we are constrained to hold that this case was fairly tried and that there was sufficient evidence sustaining the burden of proof assumed by plaintiff on the issues presented to justify the verdict of the jury.

The judgment is, therefore, affirmed, with costs to plaintiff.

BIRD, C. J., and MOORE, STEERE, BROOKE, FELLOWS, STONE, and KUHN, JJ., concurred.