## THOMSON v. ANDERSON.
### No. 12649.

Circuit Court of Appeals, Eighth Circuit.

Oct. 25, 1943.

Irwin A. Churchill, of Huron, S. D., for appellant.

Holton Davenport, of Sioux Falls, S. D. (Ellsworth E. Evans and Louis R. Hurwitz, both of Sioux Falls, S. D., on the brief), for appellee.

Before WOODROUGH, THOMAS, and JOHNSEN, Circuit Judges.

THOMAS, Circuit Judge.

The appellee, plaintiff in the lower court, as special administratrix of the estate of her deceased husband, Clark S. Anderson, brought this suit against the defendant to recover damages under the wrongful death statute of South Dakota for the death of her decedent. The defendant, appellant here, is trustee in reorganization proceedings of the property of the Chicago and Northwestern Railway Company. Plaintiff's complaint alleged that her decedent met his death on June 4, 1942, as the result of the negligence of the railway employees in the operation of one of its trains.

At the close of the evidence a motion for directed verdict was denied. A verdict was returned and judgment entered in favor of the plaintiff for $5,500 and costs. This appeal followed.

The defendant contends that the court erred on the trial of the case (1) in overruling the motion for a directed verdict; (2) in giving an instruction on the presumption of due care; and (3) in refusing two requested instructions.

The motion for a directed verdict alleged (a) that there was no proof of actionable negligence on the part of the defendant and (b) that the evidence established contributory negligence of the decedent as a matter of law.

Clark S. Anderson, plaintiff's decedent, lived at the time of the accident in the village of Vayland, South Dakota. A line of the defendant's road runs through the village approximately from east to west. The depot or station is a small wooden structure on the south side of the track. The door is on the west. Between the station and the track is a platform of cinders and gravel held in place at the north 38¼ inches from the track by a wooden curb 13 inches high. The platform is 11 feet 8 inches wide between the station and the curb, except that about the middle of the building is a projection from the main wall about two feet in width containing windows. At this point the platform narrows to 9 feet 6 inches in width. The railroad runs in a straight line and up-grade for a distance of approximately three miles west of the station. A switch post is 1036 feet east of the projection on the station.

Trains do not stop regularly at Vayland, but only when signaled to do so. No particular kind of signal was required. Any signal which informed the engineer that some one was waiting to become a passenger was sufficient. Two short blasts of the whistle constituted the acknowledgment that the signal had been observed and that the train would stop.

On the morning of June 4, 1942, Anderson accompanied his sister, now Mrs. Henderson, from his home in Vayland to the station to assist her with her bag and to signal the train scheduled to arrive about 4:53 a. m. The train was late that morning and did not actually arrive until 5:20. In the meantime Anderson and his sister waited in the station until they heard and saw the train approaching when they went out on the platform. Anderson signaled the train. The whistle sounded the usual response, but the train did not slow down and stop. As it passed the station Anderson was struck or run over and killed.

The plaintiff's theory and contention are that it was the duty of the engineer to approach the station, after the signal was given, with the train under control and to stop to receive the passenger; that Anderson, having given the signal and heard the whistle sound, had a right to expect the train to slow down and stop at the station; that, after giving the signal, he was standing on the platform at a point a few feet from its north edge, facing south toward his sister, with his back turned to the train; that, by reason of the negligence of the engineer, the train, unexpectedly to Anderson, passed at a speed of more than 60 or 70 miles per hour; and that the suction or force of the wind toward the train resulting from its rapid motion caused him to lose his balance and fall from the platform under the wheels of the train.

The defendant denies that the speed of the train as it passed the station produced air currents of sufficient force to unbalance Anderson and cause him to fall under the wheels of the train; that negligence of the defendant was not, therefore, and could not be the proximate cause of Anderson's death; and that Anderson was shown to have been guilty of contributory negligence, in that blood stains found on the pilot beam across the front of the locomotive after the accident occurred demonstrated conclusively that he was not on the platform when the train arrived at the station but instead was on the track or "too close" to it so that the pilot beam struck him.

Both theories were submitted to the jury and the first question for determination is whether the evidence is sufficient to support the verdict returned for the plaintiff both as to negligence and contributory negligence. It is conceded that in considering this issue this court must take that view of the evidence most favorable to plaintiff; that all conflicts must be resolved in favor of the plaintiff; and all permissible inferences from the evidence must be made in her favor.

The evidence bearing upon the issues of negligence and contributory negligence relates to five aspects of the tragedy: (1) the relative location of the train and of

Anderson at the time the stop signal and the sound of the whistle in response thereto were given; (2) the exact position of Anderson when the locomotive arrived at the station; (3) the speed of the train as it passed the station; (4) whether the force and direction of the air currents produced by the passing train were under the circumstances sufficient to unbalance Anderson and cause him to fall from the platform toward and under the train; and (5) whether the evidence of blood stains found on the pilot beam after the accident occurred establishes conclusively that Anderson was down on the track or so close thereto that he was struck by the front end of the locomotive. The second and fifth of these topics are of course closely related.

These questions of fact arise principally because there was no eyewitness of the accident itself. The circumstances are detailed mainly in the testimony of Mrs. Henderson, the engineer, the fireman, and expert witnesses.

Mrs. Henderson testified that she and her brother, decedent Anderson, went to the station about 4:30 in the morning with her bag, expecting the train to arrive just before 5 o'clock. They sat down in the waiting room by the window that faces west. They were there about an hour. When the train came in sight four or five miles away they walked out around the station to a point opposite and a little east of the projection on the north side of the station. Anderson put the bag down where she stopped, then stepped between the curb along the platform and the south rail of the track and waved his right arm and hand. The train was at that time about a half mile away and in plain view. A loud whistle came from the locomotive. Anderson then stepped back up on the platform. Mrs. Henderson stood about four and a half or five feet from the east wall of the projection facing north. Anderson stopped about a foot and a half or two feet from her, between her and the north edge of the platform, facing south toward her with his back to the tracks; that he must have been four or four and a half feet from the north edge of the platform. The train did not slow down as Mrs. Henderson expected it to do and as it had done on previous occasions when she had been there but just passed by going like lightning. It seemed like they were going 70 miles an hour or better. She saw the engine go past, then the dust and cinders came up from the track, and smoke came, and she closed her eyes. She opened them just as the tail end of the train went past and her brother was not there. The wind blew off her coat and hat and drew her toward the train until "I don't know why I didn't go too." She testified that at the time she closed her eyes, just after the locomotive passed by, her brother was standing there and then when she opened them he was gone. She looked around for him, thought he must have gone with that suction, ran down the track toward the east until she came to the body. She then became bewildered, screamed, and left the scene.

The fireman on the locomotive testified that he sat at the north side of the cab as the train approached, looking forward through a window. He saw the station platform clearly at a distance of a quarter of a mile; he first saw a man and a woman standing there when the locomotive was 200 feet distant; the front end of the locomotive cut off his view of them when he was 100 feet distant. The woman was four or five feet from the north wall of the station. The woman was closer to the station and the man was closer to the track. His view was on an angle. He could not tell where she stood with regard to the window in the projection; that the man was quite close to the track facing the train; that he would say there were five or six feet between the woman and the man that the man's arm looked to be about above that curbing that his feet were on the platform; that his feet would have to be approximately the length of his arm to the south of the board curbing, two or three feet possibly; that he saw him only for the interval while the locomotive traveled one hundred feet that he was standing still, looking west facing the oncoming train, that his right arm was stretched out.

The fireman also testified that the whistle began to sound about a quarter of a mile west of the station; that the train was running about 50 miles an hour; that there was no speedometer; that the train was behind time but made up about 15 minutes between Pierre and Vayland, a distance of 88.7 miles; that he saw the brake applied about 200 feet west of the station and the train stopped when the locomotive was about 200 feet east of the switch, which would be about 1436 feet east of the point at which the brakes were applied. Under

the conditions existing that day he thought that going 50 miles an hour 1000 or 1200 feet would be a good stop.

The engineer testified that as the train approached Vayland he was sitting on the right-hand side of the cab looking out. He saw the station when a quarter of a mile away. He was watching for the crossing and sounded the whistle. He judged the locomotive was 200 feet from the station when he saw somebody there. He just got a glimpse of them. He said, "I saw a fellow flagging me. He was pretty close to the railroad track * * * too close to clear, if he didn't get off. * * * I didn't know where his feet were. * * * His head and his body were leaning over. That is the way he looked to me. * * * The signal to stop is two short whistles. I didn't have time to give a signal. I was whistling for the crossing—two shorts— that is the same as answering the signal. * * * I guess I did give two short whistles, after I saw this man. I was going 50 miles an hour. * * * At that rate it would take 1000 feet or more to stop the train. The train stopped when the rear end of the train was 1000 feet east of the station and then backed up to the station."

Another witness testified that he saw the train backing up and it was then 2000 feet east of the station.

The engineer, fireman and other employees of the railroad testified that after the train stopped they found fresh blood on the south end of the pilot beam on the front of the locomotive. The engineer testified that he inspected the locomotive when he stopped at a station earlier that morning and that he did not notice any blood at that time; and that he had not encountered any object on the track afterwards.

The evidence shows that the pilot beam is a block of wood about 12 by 14 inches in size extending across the front of the locomotive. Its south end as the locomotive passed by the platform was 10 inches north of the platform and its top 3½ feet above the level of the wooden curb. Anderson was a man 6 feet 1 inch tall and weighed about 190 pounds.

Viewing all this evidence in the light most favorable to the plaintiff, as we must, it was for the jury to determine the distance the train was from the station when Anderson flagged it and the engineer sounded the whistle, the exact position of Anderson when the train arrived at the station, its speed as it passed the station, and whether the blood stains claimed to have been found on the pilot beam were there or not, and if they were how they got there, or if the blood found was that of Anderson.

The point urged with greatest emphasis by the defendant is that, assuming a finding on the foregoing matters favorable to the plaintiff, still it cannot be said that the force initiated by the passing train could account for Anderson's falling under or against the train.

The evidence in regard to the suction produced by a fast moving train is both expert and direct. Mrs. Henderson testified that she felt the suction of the wind toward the train as it passed and while she stood with her eyes closed so that it drew her and her clothing "most a foot"; that she "just braced" herself. There was evidence also that the railroad has a rule "not to stand close to a rapidly passing train." A brakeman of 21 years' experience testified that he had had occasion to be on the ground near fast moving trains; that they produce a suction which has a tendency to pull objects toward them; that the company would not allow men to stand between trains on adjoining tracks when a train was moving rapidly; that he had seen children caught when they were being drawn under; that he thought the suction toward a train is sufficient to take a man off his feet.

Prior to the trial defendant made tests at Vayland and at Beaver consisting of running the train past the station platform at speeds of 50 and 70 miles an hour. Persons standing on the platform for the purpose of observing the effect of the wind currents testified in regard to their experiences. All testified to the currents of wind which stirred up the dust as the train passed and some of them to a push away from the train as the locomotive passed. They denied feeling any force pulling them toward the train.

The testimony of the experts related to the physics of the situation and whether a rapidly moving train will produce a suction toward itself. It may fairly be said that their testimony is consistent in general to the effect that a train so moving displaces and disturbs a large volume of air; and that as the head of the locomotive passes the motion of the air is outward on

each side of the train, resembling the disturbance of water by a fast moving boat. The experts were not unanimous in regard to the action of the air currents adjacent to the sides of the train after the locomotive had passed by. Dr. Hoyam, professor of physics, and with experience in training pilots for flying airplanes, testified that a suction or force toward the train for a comparatively short distance on each side of the train follows immediately after the locomotive or front of the train passes. The change from the push outward as the head of the locomotive passes to the pressure toward the train following is almost instantaneous. Whether the pull toward the train is sufficient to unbalance a man standing near it depends, he testified, upon whether the man was aware that the suction might suddenly take place and was expecting it to occur and his sense of balance. Some of the defendant's experts agreed to the principles explained by Dr. Hoyam, but all denied the sufficiency of the force to unbalance a man and cause him to fall toward the moving train.

There is conflict as to the proper inference which may be drawn from both the expert testimony and the nonexpert testimony. We know of no decisive and established scientific principle of which the court may take judicial notice. It is clear from all the evidence that a fast moving train causes a disturbance in the air as it passes. In the case of Richardson v. Detroit & M. R. Co., 176 Mich. 413, 142 N.W. 832, 836, the Supreme Court of Michigan seemed to take judicial notice that a suction would be produced by the passing of a freight train at a speed of 30 to 40 miles an hour sufficient to draw the skirts of a woman standing near by into the wheels. In the case of Rice v. Michigan R. Co., 208 Mich. 123, 175 N.W. 454, the same court approved the submission of the question to the jury. The evidence, the contentions of the parties, and the circumstances in the Rice case closely resemble the disputed questions in the present case. See, also, Munroe v. Pennsylvania R. Co., 85 N.J.L. 688, 90 A. 254, Ann.Cas.1916A, 140; L.R.A. 1917B, 1164; Schulz v. New York, S. & W. R. Co., 87 N.J.L. 659, 94 A. 579; Jackson v. Missouri Pac. R. Co., 226 Mo.App. 29, 42 S.W.2d 932. In 44 Am.Jur., Railroads, § 457, it is said: "In cases of injury to persons lawfully on station platforms, as a result of suction or wind from a rapidly passing train, the courts have generally held that the questions of negligence and contributory negligence were for the jury, and have assumed apparently that recovery for such an injury is not precluded on the ground that it should not reasonably be anticipated."

Without extending this opinion with a detailed discussion of the evidence, we are satisfied that the court did not err in submitting both the questions of the negligence of the defendant and the contributory negligence of the decedent to the jury. Had the train come to a stop at the station the pressure of air currents could not have been an appreciable force. The court instructed the jury that the employees in control of the operation of the train were charged with the duty to keep a lookout for people desiring to flag the train or on the platform, and with the duty to approach the station with the train under such control that it could be stopped within a reasonable distance. No exception was taken to this instruction. The jury was warranted in finding from the evidence that these duties were violated, resulting in the death of Anderson.

It is argued that because the arrival of the train was expected Anderson could not be surprised by its approach and that he should have removed himself farther from the edge of the platform. It is conceded that while the train was at some distance he had a right to assume that it would stop opposite the platform, but defendant claims that the sound of the train should have warned him that it was coming at high speed in time for him to leave the zone of danger. The fact situation does not establish contributory negligence as a matter of law. The train was traveling, according to plaintiff's evidence, more than 100 feet per second. All the surrounding circumstances, including the right to assume that the train would stop, were for consideration of the jury in determining contributory negligence, or its absence. Brott v. Auburn & S. Electric R. Co., 220 N.Y. 92, 115 N.E. 273. See, also, Lundien v. Ft. Dodge, D. M. & S. Ry. Co., 166 Iowa 85, 147 N.W. 308.

Defendant's second contention is that the court erred in instructing the jury on the presumption of due care on the part of Anderson. There was and is no exception or objection to the instruction given as a correct statement of law. The criticism is that the instruction was inappro-

priate because the testimony of eyewitnesses showed the position and conduct of Anderson just prior to the instant of his death and the testimony of fresh blood on the pilot beam demonstrated what took place after the locomotive cut off the view of the fireman, after Mrs. Henderson closed her eyes, and after the engineer turned his attention to the brakes in an effort to stop the train.

In support of this contention defendant relies principally upon St. Louis & S. F. R. Co. v. Chapman, 8 Cir., 140 F. 129. That case is distinguishable from the present case on the facts, and is not therefore controlling here. The claim of contributory negligence was an important issue in the present case. The conduct of Anderson, whether his action or failure to act in a moment of time constituted due care or negligence, was decisive. If there were time for Anderson, after he was observed by the engineer and the fireman, deliberately to place himself in front of the locomotive where he would be struck by the pilot beam, the south end of which was 10 inches north of the platform, then the instruction was appropriate. On the other hand, if it be admitted that at the time the head of the locomotive passed him Anderson was standing in front of Mrs. Henderson facing south, then the charge of contributory negligence is eliminated and the instruction was harmless. None of the cases cited by defendant are applicable. The evidence is not conclusive that at the last moment possible Anderson leaped in front of the train. Contributory negligence was a jury question, and the instruction on due care was appropriate.

The first element of defendant's third contention is that the court erred in refusing a requested instruction on contributory negligence as a defense. It is conceded that failure to give the requested instruction could not be complained of if the subject were adequately covered by the instructions given. We think the subject was fairly covered. The requested instruction stated that "It is always the duty of a person to use reasonable care and vigilance to protect himself from injury * * * it was the duty of Clark S. Anderson to use reasonable care and vigilance to discover and protect himself from danger." The instructions given told the jury that "The law imposes upon everyone the duty to exercise due care and caution for his own safety." The request: "By reasonable care and vigilance is meant such care and vigilance as a reasonably prudent person would exercise under the same conditions and surrounding circumstances." The instructions given: "In general, it may be stated that due care and caution is that degree of care or caution which would be exercised by a person of ordinary intelligence and experience, under identical circumstances as those involved in the case under consideration." The requested instruction: "If you find that Clark S. Anderson failed to exercise such care and vigilance for his own protection, and that such failure contributed to his injury, then the deceased would be guilty of contributory negligence." The instruction given: "Contributory negligence is a want of due care and caution on the part of the person injured or killed * * * even though you find that the defendant * * * was guilty of negligence, and that negligence cooperating with the contributory negligence of the decedent, Clark Anderson, resulted in his death * * * then the plaintiff can not recover." Every point in the requested instruction is elaborated upon in the given instruction. There was no error in refusing the requested instruction.

The second element of defendant's third contention is that the court erred in refusing to submit to the jury the following interrogatories:

(1) With what part of the train did Clark S. Anderson first come in contact?

(2) What caused Clark S. Anderson to be struck by some part of the train?

It is conceded that the submission of interrogatories to a jury is within the discretion of the trial court. Walker v. New Mexico, etc., R. Co., 165 U.S. 593, 17 S.Ct. 421, 41 L.Ed. 837; Victor-American Fuel Co. v. Peccarich, 8 Cir., 209 F. 568, 571, certiorari denied 232 U.S. 727, 34 S.Ct. 603, 58 L.Ed. 817. It is not shown that the refusal in this case constituted an abuse of discretion justifying a reversal. The contention of the plaintiff in respect of the answer to each question was simple and not confusing. She contended (1) that Anderson came in contact first with the side of the train behind the front of the locomotive; and (2) that he came in contact with it because the suction of the train threw him off his balance. Such theory requires no clarification by interrogatories. There was no abuse of discretion and no error.

The judgment is affirmed.